Good morning, Counsel. Thank you, Your Honor. Thank you. May it please the Court, I'm Charles Bartley for the plaintiff and the appellant in this particular case. The question in front of the Court, I believe, is how many contacts are needed in order to be defendant-only. So, it's been Mr. Mackey, representing the defendants, the authorized agent of the defendants, made 45 emails from him to Oregon concerning this $9 million transaction. He made 11 phone calls from the seller to Oregon concerning this transaction. As a result, the parties signed an agreement to sell and buy these properties, which are located in Florida. I believe Mr. Mackey was located in Michigan at the time, but the plaintiff was located in Oregon. They knew the plaintiff was located in Oregon before this unit started. Counsel, may I ask you, what case or cases, I'm going to give you your strongest case, for the proposition that sending emails and making phone calls into a jurisdiction without the other person coming to the jurisdiction is sufficient to confer a personal jurisdiction upon the defendant. What's your strongest case? The case that I would refer the Court to is the 9th Circuit case, Oshado v. Hansen, which emphasizes that we are looking for affirmative conduct. It doesn't necessarily have to be emails, phone calls. It has to be some affirmative contact into the state of Oregon, and it has to be knowing you can't just send this off not knowing if there were six taxes or whatever. In this case, the record shows right from the very beginning. The case you cited was that a case where there was nothing but emails? The case you decided was your best case was that a case where there was nothing but email contact? No, it wasn't an email case. Well, how does that help in an email case? Well, I suggest that there is no difference between emails or fax communications, telephone communications, written old-fashioned letter communications. It still results in the same thing if it's knowing, and this record shows right from the very beginning. This is the email, February 26th email, 2014. Thanks for the update, Ginger. We will run with these people from Oregon. And it was three weeks later that they signed the agreement. But, Counsel, in Oshado, didn't we affirm the district court's dismissal of the complaint for lack of jurisdiction? Yes. So how does that help your argument? Well, because it sets forth the rules that presumably the parties are to follow. That is, there has to be a purposeful availment of Oregon. They have to knowingly do that. But the point is, does the sending of emails amount to an availment? Especially in this case, most of the emails were sent after the deal was already agreed to. Both of them were. Right. So how is that an availment? Well, what happened? Well, there was an original agreement signed, and there was an amendment. There was actually two amendments. The first was a second amendment, during which time all of these emails and phone calls occurred. And so it's no surprise to the defendants to be hailed into court in Oregon. It's not unfair to bring them to Oregon. They wanted to get $9 million out of Oregon. And it seems like their conduct was an affirmative conduct. It is isolated to this transaction. There weren't other business transactions or social things that are discussed in these emails. It is all just this particular transaction. So it satisfies the second rule that we find out of the Bruchetta case, that the claims must arise out of the defendant's forum-related activities. These claims exclusively arose out of that. The purposeful availment and the forum-related activities in this particular case show that these people knowingly dealt with Oregon, and they constipated the transaction as a result of all that. It took them three weeks. But before they even started it, they knew it was in Oregon. There is a question raised concerning Mr. Mackey, whether he was the authorized agent. I point out the record shows that the complaint alleges that the LLC defendants entered into a real estate versus sale agreement. The complaint says this as part of the record. The agreement between the parties, which is part of the record, says the person signed for the seller has full right to the power and authority to sell, transfer, convey, or assign. So the record, at least on a prime occasion, shows that there is authority on the part of Mr. Mackey. Now, the defendants come in and say, well, Mr. Mackey really didn't have any authority whatsoever. Well, that is a factual dispute, but under the Shotto case, any disagreements between the affidavits are resolved in favor of the complaint. So the issue of whether Mr. Mackey had authority or not is going to have to be resolved by the district court after we have a hearing and evidence on that particular thing. Finally, the defendants have submitted a Florida judgment to the court for consideration. We have not had any time to respond. I submit that it is not relevant to this proceeding. It's just another factual issue to be resolved by the district court after discovery and after briefing. Thank you. Thank you, Cassidy. Good morning, Your Honors. My name is Robert Altser, and I represent the exit strategy defendants and affidavits in this case. Mr. Monahan represents Dwight and Mr. Mackey. I'll be speaking for possibly seven to eight minutes, and then Mr. Mackey will also speak. Would there be a minute of time? Yes, ma'am. Just to begin with, on the Shotto, I want to make a point that I'm quoting from that case, a one-time contract for the sale of a good to involve the forum state only because that is where the purchaser happened to reside but otherwise created no substantial connection or ongoing obligations there was persuasive to that court. In my case, this contract wasn't even to be performed in Oregon. This is for the sale of real estate in Florida. So this is even a stronger case for affirmance under a Shotto. Just for the roadmap, for my clients in this case, there are absolutely no jurisdictionally relevant contacts between exit strategy who own the properties in Florida and the state of Oregon in any way. The only way there can be jurisdiction is through an agency relationship with White Pie, and therefore if there are sufficient contacts over White Pie. So you'll have to get through both of those to get to jurisdiction with our client. And so we're, of course, saying that there's no agency and there's no minimum contacts over White Pie. By the way, the other one was in it, the 28-J matter right on the Florida case. Yes, sir. Were those the same claims that are involved here? Yes, I'll explain that. After the district court dismissed this case, our clients filed a suit in Florida alleging essentially a slander of title against Coast Equities. And the basis for that is Coast Equities took the pendency of this action and filed notices of pendencies of action, lease pendents basically, to cloud the title in Florida. And so our clients sued there. Coast Equities counterclaimed the breach of the very same contract against the very same parties. And that court in Florida dismissed those counterclaims with prejudice a year ago and just a few weeks ago granted Coast Equities, excuse me, that's a strategy, my clients, affirmative summary judgment And by now, all those lease pendents, in blind close from ever filing another set of lease pendents, have nothing to do with the KSA and found that they had engaged in a pattern of unreasonable behavior with respect to that. So we think it's entirely relevant, if only to the substantial equity question in our weather argument. How could it be a substantial inequity to recognize the weather in this case when they've fully litigated it already? And I would even pose, how could it be reasonable to have my clients in the court in this jurisdiction when it's already been litigated? It's just per se unreasonable. Beyond that, my question is, doesn't that judgment make this case moot? Yes, I would answer in that sense. I don't believe it does, Your Honor. We did not file a motion to dismiss on mootness because, you know, we have, we're going to have to establish restrictions on a collateral establishment. I thought that was a little bit complicated. We can do that. You thought it was a lack of personal jurisdiction argument? Exactly, Your Honor. It's never been to the reasonableness question here. It just can't be reasonable. What would be willing to both the issue of collateral estoppel or restatement? Yeah. So getting back to the main argument, as far as agency goes, there is no allegation of agency in a complaint. What was directly referred to as just a roping of everybody as being represented in a sale, but there's no agency that alleges or evidence in the record from their side saying that exit strategy hereby authorized right by to act on its behalf to affect the PSA, which, by the way, COAST was not an original party to. The original party to the PSA has nothing to do with Oregon. COAST Equities inserted itself into the transaction. That's a unilateral act by a third party having nothing to do with my client or, frankly, right by either. All of a sudden, an assignee appears, and that assignee happened to have a manager in Oregon, and the contacts between right by and the manager in Oregon are simply communications. In fact, either the magistrate judge or the district judge intimated that most of any arm or all would be filled in California. Were there some languages that affected that? Well, I think the language was we don't know where the effect would be found. There's some allegation, although it's not clear, that there's a number of COAST-added equities that's in California and one that's in Oregon, but there's nothing on the record to show actually where any economic harm would be found. I think that's what the judge said. But I think COAST is emphasizing quantity of contacts that actually happened after the agreement was entered into, but I think the cases post-Weldon, and especially exemplified by the PICO case, Judge Tashima, that you wrote, show that you don't look at quantity of contacts. You look at actual relationships and form-related activities by the defendant, and I submit there's none on behalf of that strategy. There's nothing in the record to contradict those strategies. This session, there's no agency. The principal of my client submitted an affidavit in the record saying no one was authorized to enter into this deal, and that you can't focus on the plaintiff. I think that's the point of Weldon and PICO. You can't focus on the plaintiff just because he happens to be in Oregon. You have to look at the activity of the other, you have to look at the defendant's activities with respect to the forum. Thank you. Yes. Also, please don't brief anything unless we ask to supplement a briefing. Yes, ma'am. Thank you. Thank you. Good morning. It's nice to talk to you all again on behalf of Roy By Properties and Ron Mackey. Let me first just say that I think the smartest thing I did in terms of preparing for this morning's argument was having Mr. Eltser come up first. I'm tempted just to say ditto, maybe sit down. But since I've got a few moments here, let me get at a couple of key points. The first point I want to point out is it isn't 45 emails, it isn't 11 phone calls. The actual time frame is the following, March 13, right by the private accessory company Mount Helix entering into the PSA. April 10, the plaintiff, Mount Helix has signed Mount Helix's rights at their request. And then April 23 is the date that the lower court found the cause of action to arise because that was the date for closing under the PSA and it didn't close. Between that time, there were only five phone calls to nine emails. The very first phone call was March 24, not in February. The email that counsel referenced in his presentation is an email from my client, his agent in Florida is not even a contact into Oregon. It's simply an email to his associate in Florida saying, we're going to run with this Helix company, which two representatives in Oregon at the time. Those contacts are all contacts that predated the actual agreement which forms the basis for their cause of action. It cannot be said that they were trying to transact business with those emails because the business was already done. It already signed in the agreement. I want to read an echo that Mr. Aldrich had cited about on coastal equities having to protect themselves against the steel. That's exactly what happened. Right by properties where I'm at, he did not reach into Oregon. Someone from Oregon reached into their deal and then we put South Sea in here. All right. Thank you, counsel. We've seen your time. Your bottle. Thank you, Your Honor. There were ongoing obligations to this particular case. This wasn't something where the plaintiff pays the money and they exchange simultaneously the title. This is something that goes on for a long period of time. There's warranty issues. There's due diligence that still had to be conducted. They had to furnish the proper title, and then the parties had to close. Those are transactions that go on for weeks, if not months. Counsel, do you agree that the Florida action moves this case? I'm not able to address that. I just got it on May 31st. I received the information at the same time. I presume that the court did. I have not been able to research that, analyze it, and be able to get back to everybody. Again, I think it's another factual dispute. If it was a statute of limitations defense, we'd still send that back down to the district court to determine. They claim that there is no agency relationship. The record, and it's in dispute, but the record shows by location that there was agency because the contract itself says that Mr. Mackey had authority to sign for everybody. The signature lines say authorized agent, so there is at least a prima facie case that there was agency relationship. That means they say he's entitled to and he has authority to sign. Any factual dispute concerning the agency should be resolved for the court. The plaintiff is entitled to the presumption in a jurisdictional issue, or should have the presumption in favor of our allegations and our declarations that are in there. The timing on all of these issues, the defendants knew in February 2014 that they were dealing with Oregon. The transaction went on. There was an original transaction signed, and then it was assigned to Coast, and there was a First Amendment, and there was a Second Amendment. Those were all part of the transaction. You can say, well, the original agreement didn't even include Coast. That's correct, but the amendments did. The amendments included Coast all the way through. So the communications between the parties were ongoing. I submit to the court that that is far more than minimum contacts that are required in a particular case, especially involving federal court where travel is an inconvenience for either side. Thank you. Thank you, counsel. Thank you to both counsel. The case has argued and is submitted for decision by the court.
judges: Tashima, Gould, Rawlinson